### IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | |
|---|---|
| ———————————————— ) | |
| WINNEMUCCA INDIAN COLONY, ) | |
| ) | |
| Plaintiff, ) | No. 20-1618 |
| ) | |
| v. ) | Filed: August 25, 2023 |
| ) | |
| THE UNITED STATES, ) | |
| ) | |
| Defendant. ) | |
| ———————————————— ) | |

### OPINION AND ORDER

Plaintiff Winnemucca Indian Colony ("Plaintiff" or "Colony") filed this breach of trust action against the United States, alleging the Bureau of Indian Affairs ("BIA") failed to fulfill various trust responsibilities it owed to the Colony. The events underpinning Plaintiff's claims relate to a long-running internal tribal dispute about the Colony's proper membership and leadership. Plaintiff contends the BIA's refusal to recognize the rightful leadership faction of the Colony for nearly two decades resulted in nonmembers unlawfully occupying the Colony's land, diverting its natural resources, and stifling economic development. It seeks more than $208 million in monetary damages, as well as declaratory judgment and an accounting of the Colony's trust assets.

Before the Court is the Government's Motion to Dismiss the Amended Complaint. The Government contends Plaintiff's claims should be dismissed primarily for lack of subject-matter jurisdiction on several grounds, including standing, 28 U.S.C. § 1500's statutory bar on jurisdiction, the statute of limitations, and Plaintiff's failure to identify a money-mandating source of substantive law. For any claims that survive, the Government seeks dismissal for failure to state a claim upon which relief may be granted. Also before the Court is Plaintiff's Motion to File a

Surreply and Plaintiff's Motion to Strike the Government's recent Notice of Additional Authority. Because the Court concludes that it lacks jurisdiction over Plaintiff's claims, it must **GRANT** the Government's Motion and **DISMISS** the Amended Complaint. The Court further concludes that Plaintiff's proposed surreply does not address new arguments and is not necessary for the Court's disposition of the Government's Motion and, as such, **DENIES** its request to file a surreply. The Court likewise **DENIES** Plaintiff's Motion to Strike the Government's Notice of Additional Authority and instead **GRANTS** Plaintiff's alternative request to consider its response.

## BACKGROUND

### I.     Factual History

#### A.     Leadership Dispute

The Colony is a federally recognized Indian Tribe located in northern Nevada. *See* Pl.'s Am. Compl. ¶¶ 2, 6, ECF No. 22. In 1916, President Woodrow Wilson set aside by executive order 320 acres of land for homeless Shoshone Indians that is now held in trust for the Colony. *Id.* ¶ 6. In 1928, Congress set aside and additional 20 acres. *Id.* ¶ 7. Membership in the Colony is limited to individuals who are one-quarter Paiute or Shoshone by blood quantum, are descended from a person listed in the 1916 tribal census, and who have not taken money or land as a result of membership in another tribe. *Id.* ¶ 11. Qualifying members elect a council to represent the Colony's interests in government-to-government relations with the BIA, which manages the trust responsibility to the Colony on behalf of the United States. *Id.* ¶ 5.

The leadership dispute underlying Plaintiff's claims dates back more than 20 years. From 1990 to 2000, the BIA recognized a tribal council led by Winnemucca Council Chair Glen Wasson as the government of the Colony. *Id.* ¶¶ 32, 37. On February 22, 2000, Wasson was stabbed to death on the doorstep of the Colony's Administrative Building. *Id.* ¶ 39. His murder initiated a

power struggle among the remaining members of the council to decide who would assume control of the Colony's government. *Id.* ¶¶ 40–50.  Two factions each claimed to be the legitimate tribal council and asserted control over the Colony's assets. *Id.*  One faction—the Wasson group (led by council member Sharon Wasson)—believed the leader of the competing group, council member William Bills, did not qualify for tribal membership because of his lineage. *Id.* ¶¶ 38, 50.  Later that year, the BIA withdrew its recognition of the tribal government while the Colony resolved the leadership dispute. *Id.* ¶¶ 44, 46.  Things came to a head in 2002 after several years of litigation before the Tribal Court when a specially appointed appellate panel, the "Minnesota Panel," ruled in favor of the Wasson group. *Id.* ¶ 63.[1]

Following the Minnesota Panel decision, the Wasson group requested the BIA to recognize it as the rightful government of the Colony. *Id.* ¶ 64.  Despite repeated requests, the BIA refused to recognize the group, citing the outstanding leadership dispute and remaining tribal remedies. *Id.*  As of May 17, 2007, all tribal remedies had been exhausted, and the Inter-Tribal Court of Appeals of Nevada issued a decision dismissing all further appeals in recognition of the Minnesota Panel's decision as final. *Id.* ¶ 65.  On March 6, 2008, in connection with an interpleader action filed by the bank holding the Colony's account of funds, the United States District Court for the District of Nevada issued an opinion agreeing that all tribal remedies had been exhausted and granting the Minnesota Panel decision comity. *Id.* ¶ 67.  Still, the BIA refused to recognize a Colony government. *Id.* ¶¶ 68, 73.

The Wasson group then turned to the Interior Board of Indian Appeals ("IBIA"), which hears appeals of BIA decisions. *Id.* ¶ 74.  The IBIA determined that the BIA was required to

---

[1] The Colony funded the Minnesota Panel because, at the time, the BIA had not funded the Inter-Tribal Court of Appeals of Nevada; thus, no government-provided appellate process was available. ECF No. 22 ¶¶ 59, 62.

recognize a leadership group of the Colony when a reason existed. *Id.* In light of allegations of trespass by nonmembers on the Colony's land, it ordered the BIA to recognize a Colony government. *Id.* When the BIA did not do so, and instead barred Colony members from entering the land in May 2011 to rehabilitate an abandoned smoke shop, the Wasson group sought injunctive and declaratory relief in the District of Nevada to prohibit the Government from interfering with the Colony's activities on their land and to establish themselves as the Colony's duly elected government ("Nevada Case"). *Id.* ¶ 83; *see* Compl., *Winnemucca Indian Colony v. United States ex rel. Dep't of the Interior*, No. 11-622 (D. Nev. Aug. 29, 2011), ECF No. 1. After several more years of litigation and various rulings against the BIA, the BIA (acting pursuant to the district court's order) recognized the Wasson group by letter dated December 13, 2014. ECF No. 22 ¶¶ 83–84, 86–87, 89, 96. Another competing Colony faction, the Ayer group, who had intervened as a defendant in the Nevada Case, appealed to the Ninth Circuit Court of Appeals. The Circuit ultimately vacated all of the district court's orders from 2011 to 2018 for lack of subject-matter jurisdiction. *See Winnemucca Indian Colony v. United States ex. rel. Dep't of Interior* (*Winnemucca*), 819 F. App'x 480, 483 (9th Cir. 2020). The Government did not participate in the appeal.

In April 2021, due to the BIA's need to administer contracts with the Colony under P.L. 93-638, the BIA issued an interim tribal government recognition to the Wasson group. Ex. 1 to Def.'s Mot. for Enlargement of Time at 9–12, ECF No. 16-1. On January 11, 2022, the Acting Regional Director of the Western Regional Office of the BIA issued a final decision letter on how the Western Regional Office would continue necessary government-to-government relations with the Colony, including continued recognition of the Wasson group for government-to-government contracting purposes until "an adjudication of the underlying membership and election disputes by

a tribal forum" requires otherwise.  Ex. 1 to Def.'s Notice of Additional Authority at 15–16, ECF No. 20-1.

### B.  Resulting Losses to the Colony

Plaintiff alleges that because of the ongoing leadership dispute and the BIA's failure to permanently recognize a government of the Colony during the dispute, the BIA failed to fulfill its trust responsibilities to the Colony and prevented the Colony from managing and preserving its resources, leading to disrepair and decay of Colony lands and buildings.  *See, e.g.*, ECF No. 22 ¶¶ 85, 140–46, 177–78.  Plaintiff alleges that during the pendency of the leadership dispute, the BIA and individuals residing on Colony land—who Plaintiff claims are unlawfully trespassing— threatened Colony members, preventing them from entering and managing the Colony's property. *Id.* ¶¶ 40–41, 76, 78–79, 108, 141, 177, 221.  As a result, Plaintiff alleges the Colony's lands suffered numerous encroachments and harms, which the BIA failed to prevent or remedy.  *Id.* ¶¶ 85, 177–78.

In particular, the BIA continued to maintain leases for HUD housing on Colony land to individuals who Plaintiff contends are not members of the Colony.  *Id.* ¶¶ 29, 41, 79–81, 108, 111, 220.  Plaintiff alleges the BIA never required the residents to pay rent and never collected any payments.  *Id.* ¶ 174.  It also asserts the BIA never transitioned possession of Colony homes to members, and Colony members have been forced to reside outside of the reservation at the Colony's expense.  *Id.* ¶¶ 41, 108, 177–78, 221.  According to Plaintiff, the BIA and the nonmember residents also have failed to properly maintain the premises, resulting in open contamination of hazardous waste on the land.  *Id.* ¶¶ 113, 175.

In addition, the BIA allegedly allowed several physical encroachments on Colony lands without the Colony's consent and without compensation to the Colony.  *Id.* ¶¶ 132–39.  These

encroachments include a road, overhead powerlines, an electrical substation, and easements granted to a neighboring subdivision. *Id.* Plaintiff alleges that the subdivision also has placed several structures on Colony lands, including a garage, shed, road, driveway, and part of a trailer park. *Id.* ¶ 196. Plaintiff further contends that the BIA allowed the Offenhauser Development Company, which designed the subdivision, to divert a stream off Colony lands without permission and without any compensation to the Colony. *Id.* ¶¶ 124–26. And the BIA has allegedly permitted the neighboring subdivision to discharge storm sewer runoff directly onto Colony lands. *Id.* ¶¶ 127–28. Plaintiff contends that the BIA has failed to recapture the water that once naturally flowed through Colony lands or collect compensation for the Colony's water loss. *Id.* ¶¶ 129–31.

Before the leadership dispute, the Colony operated a successful smoke shop and maintained an administrative building, both on Colony land. *Id.* ¶¶ 140, 144. Plaintiff alleges that because trespassers and the Government excluded Colony members from the land, the smoke shop ceased operations and the administrative building fell into disrepair. *Id.* ¶¶ 141–42, 146. Plaintiff claims the BIA made no effort to preserve these structures, nor has it compensated the Colony for the resulting losses. *Id.* ¶¶ 143, 149.

## II.   Procedural History

On November 18, 2020, the Colony filed a complaint in this Court ("Original Complaint"). *See* Pl.'s Compl., ECF No. 1. The Original Complaint raised ten claims for relief: (1) Violation of 25 U.S.C. § 323 *et seq.*—land use; (2) Violation of 25 U.S.C. § 323 *et seq.*—land use in relation to energy station; (3) Breach of Trust—Water; (4) Agency action unlawfully withheld or unreasonably delayed; (5) Breach of Trust pursuant to the Indian Non-Intercourse Act; (6) Breach of Fiduciary Duty; (7) Demand for Documents and Accounting; (8) Declaratory Judgment—Right to royalties for use of land; (9) Loss of use of lands and rights as Tribal members by the individual

members of the Colony; and (10) Declaratory Judgment—Right to lands granted to the other western tribes of BLM and other government lands pursuant to the repatriation of Tribal Lands process. *Id.* at 23–31.

After the Government filed a Motion to Dismiss under Rules 12(b)(1) and 12(b)(6) of the Rules of the United States Court of Federal Claims ("RCFC"), the Colony moved to amend the Original Complaint. *See* Mot. to File First Am. Compl., ECF No. 15; Proposed First Am. Compl., ECF No. 15-1. The Proposed Amended Complaint eliminated the claim for agency action unlawfully withheld, added a claim for violation of 25 U.S.C. § 4101, added a claim alleging Plaintiff lacks an available remedy at law, corrected facts about land use, clarified facts about encroachment, and provided jurisdictional facts in an attempt to overcome the Government's first Motion to Dismiss. *See* ECF No. 15 at 4. The Court granted the amendment over the Government's opposition, and the Colony filed its Amended Complaint on February 1, 2022 ("Amended Complaint"). *See* Order Granting Mot. to Amend Pleadings, ECF No. 21; ECF No. 22. On March 18, 2022, the Government filed a second Motion to Dismiss. *See* Def.'s Mot. to Dismiss ("MTD"), ECF No. 23. The Motion is now fully briefed. *See* Pl.'s Resp. to MTD, ECF No. 25; Def.'s Reply to MTD, ECF No. 28. On August 17, 2022, Plaintiff filed a Motion for Leave to File Surreply, which is also fully briefed. *See* Pl.'s Mot. to File Surreply, ECF No. 29; Def.'s Resp. to Pl.'s Mot. to File Surreply, ECF No. 30; Pl.'s Reply to Mot. to File Surreply, ECF No. 31. On January 19, 2023, the Court held oral argument.

On July 6, 2023, Plaintiff filed a Notice of Additional Authority, informing the Court of the Supreme Court's decision in *Arizona v. Navajo Nation*, 143 S. Ct. 1804 (2023), which it argues is relevant to the pending Motion to Dismiss. *See* Notice of Additional Authority, ECF No. 35. On July 12, 2023, Plaintiff filed a Motion to Strike Notice of Additional Authority, or, in the

Alternative, Response Thereto. *See* Mot. to Strike, ECF No. 36. Plaintiff argues that the Court's rules do not allow for such a notice to be filed and, in any event, that *Navajo Nation* does not impact its breach of trust claims. *Id.* at 1–2.

The Court notes that this is the second lawsuit filed by the Colony in the Court of Federal Claims. In 2014, another judge of the court dismissed an action brought by the Colony seeking monetary damages from the United States for nearly identical harms. *See Winnemucca Indian Colony v. United States*, No. 13-874, 2014 WL 3107445, at *3 (Fed. Cl. July 8, 2014). The court granted dismissal for lack of jurisdiction under 28 U.S.C. § 1500 because of the concurrent Nevada Case pending at the time. The court held that the district court case involved substantially the same operative facts related to the BIA's refusal to recognize the Wasson group as the Colony's government. *Id.* at *4 (holding that both cases involved "factual questions of who, if anyone, constituted the legitimate Colony leadership; whether the individuals in question had authorization from that leadership to enter Colony lands; and when and under what circumstances the BIA took (or did not take) action to recognize a government").

At the time the instant action was filed, the Ninth Circuit had issued its decision vacating the district court's prior orders in the Nevada Case for lack of subject-matter jurisdiction. *Winnemucca*, 819 F. App'x 480 at 483 (opinion issued June 15, 2020). But the Ninth Circuit did not issue the mandate effectuating its June 2020 judgment until December 23, 2020, over a month after Plaintiff filed the Original Complaint in this case. *See* Mandate, *Winnemucca*, No. 18-17121 (9th Cir. Dec. 23, 2020), ECF No. 65.

## LEGAL STANDARDS

### I.   Motions to Dismiss Pursuant to RCFC 12(b)(1)

Before reaching the merits of a plaintiff's action, the Court must as a threshold matter assure itself that subject-matter jurisdiction exists. RCFC 12(b)(1), (h)(3); *see Steel Co. v. Citizens*

*for a Better Env't*, 523 U.S. 83, 94–95 (1998) (affirming that subject-matter jurisdiction "'spring[s] from the nature and limits of the judicial power of the United States' and is 'inflexible and without exception'" (quoting *Mansfield v. Swan*, 111 U.S. 379, 382 (1884))). The plaintiff bears the burden of establishing by the preponderance of evidence the Court's jurisdiction over its claim. *See Estes Express Lines v. United States*, 739 F.3d 689, 692 (Fed. Cir. 2014).

When deciding whether to dismiss a complaint pursuant to RCFC 12(b)(1) for lack of subject-matter jurisdiction, the Court must accept all factual allegations as true and draw all reasonable inferences in the claimant's favor. *See Henke v. United States*, 60 F.3d 795, 797 (Fed. Cir. 1995). However, if a complaint contains challenged factual allegations, for purposes of ruling on a motion to dismiss, the court may inquire into facts necessary to support jurisdiction and may resolve disputed facts. *See Al Johnson Constr. Co. v. United States*, 19 Cl. Ct. 732, 733 (1990); *see also Indium Corp. of Am. v. Semi-Alloys, Inc.*, 781 F.2d 879, 884 (Fed. Cir. 1985) (affirming that a court may consider "evidentiary matters outside the pleadings" when assessing a Rule 12(b)(1) dismissal).

## II.     Motions to Dismiss Pursuant to RCFC 12(b)(6)

The Court must also dismiss an action if it fails to state a claim for which relief may be granted. RCFC 12(b)(6). To avoid dismissal under RCFC 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). Although a complaint need not contain detailed factual allegations to raise a plausible claim, a plaintiff must provide "more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555; *see Papasan v. Allain*, 478 U.S. 265, 286 (1986) (holding that a court is "not bound to accept as true a legal conclusion couched as a factual allegation"). In deciding a motion under RCFC 12(b)(6), the Court may

consider the complaint itself, "the written instruments attached to it as exhibits, 'documents incorporated into the complaint by reference, and matters of which a court may take judicial notice.'" *Todd Constr., L.P. v. United States*, 94 Fed. Cl. 100, 114 (2010) (quoting *Tellabs, Inc. v. Makor Issues & Rts. Ltd.*, 551 U.S. 308, 322 (2007)), *aff'd*, 656 F.3d 1306 (Fed. Cir. 2011).

## DISCUSSION

The Court lacks jurisdiction over each of Plaintiff's claims because they are barred pursuant to 28 U.S.C. § 1500, fail to identify money-mandating sources of substantive law, are outside the statute of limitations, and/or seek equitable relief that is beyond the Court's statutorily prescribed jurisdiction.[2]

### I.   The Court Lacks Jurisdiction Over All Claims Except Count Nine Because Plaintiff Had Another Suit or Process Pending Against the United States When It Filed Its Original Complaint.

The Government contends the Court lacks jurisdiction pursuant to 28 U.S.C. § 1500 over Counts One through Eight, Ten, and Eleven because they are substantially the same as the claims in the Nevada Case, which was pending on appeal before the Ninth Circuit ("Ninth Circuit Appeal") at the time the Colony filed its Original Complaint.  ECF No. 23 at 32.  Winnemucca argues that the Court has jurisdiction because the Government was not a party to the Ninth Circuit Appeal.  ECF No. 25 at 23.  The Court concludes that, although the Government did not actively participate in the appeal, Plaintiff nevertheless had a pending suit or process against the United States at the time it filed its Original Complaint, and the Court accordingly lacks jurisdiction over

---

[2] Because the Court has determined that each of Plaintiff's claims should be dismissed on jurisdictional grounds, and because the Government's standing argument addresses what amounts to a pleading issue, it is unnecessary to determine whether Plaintiff has sufficiently pleaded facts showing that this suit is brought by and through the Colony's duly elected council.  It is likewise unnecessary to determine whether Count Two should be dismissed under RCFC 12(b)(6) for failure to state a claim.

all but one of Plaintiff's claims.

Section 1500 bars jurisdiction over a claim in the Court of Federal Claims "if the plaintiff has another suit for or in respect to that claim pending against the United States or its agent." *United States v. Tohono O'Odham Nation*, 563 U.S. 307, 311 (2011). To determine whether § 1500 applies, the Court must analyze: (1) whether the plaintiff has an earlier-filed suit "pending" in another court; (2) whether that suit is pending "against the United States;" and (3) whether the claims asserted in the earlier-filed suit share the same operative facts as the claims asserted in the later-filed suit in the Court of Federal Claims. 28 U.S.C. § 1500; *see HEALTHeSTATE, LLC v. United States*, 146 Fed. Cl. 681, 686 (2020); *see also Brandt v. United States*, 710 F.3d 1369, 1374 (Fed. Cir. 2013). Each question must be evaluated based on the state of things at the time the action in the Court of Federal Claims was filed, and the jurisdictional bar continues even if the earlier-filed action is subsequently resolved. *Keene Corp. v. United States*, 508 U.S. 200, 209 (1993); *Prophet v. United States*, 106 Fed. Cl. 456, 465 (2012). If the Court answers all questions in the affirmative, the case must be dismissed. *Winnemucca Indian Colony*, 2014 WL 3107445, at *2.

Plaintiff does not dispute that the Ninth Circuit Appeal was pending at the time it filed its Original Complaint because the Ninth Circuit's mandate had not yet issued, nor does it dispute that the claims asserted in that case are substantially the same as the claims in this case. Indeed, the Colony's prior, similar suit brought in this court was dismissed under § 1500 due to the same concurrent litigation. *See id.* at *4. Rather, Plaintiff argues that the Ninth Circuit Appeal was not pending "against the United States" because the Government was not participating in the appeal. ECF No. 25 at 23 (quoting 28 U.S.C. § 1500). The Court must thus decide whether the United

States' decision not to join a pending appeal in an earlier-filed case that otherwise meets § 1500 removes the statute's jurisdictional bar.  The Court holds that it does not.

Although the parties do not cite any cases addressing this exact scenario, the ample body of caselaw interpreting and applying § 1500 undercuts Plaintiff's argument.  Plaintiff's argument focuses narrowly on who was litigating the Ninth Circuit Appeal rather than the claim subject to the appeal.  A "suit or process," however, includes both an action filed in the lower court and any ensuing appeal, which is "pending" once a notice of appeal is docketed and remains "pending" at least until the appeals court issues a mandate effectuating judgment.  *Hood v. United States*, 659 F. App'x 655, 661 (Fed. Cir. 2016) (citing *Brandt*, 710 F.3d at 1380); *Nycal Offshore Dev. Corp. v. United States*, 148 Fed. Cl. 1, 14–15 (2020) (holding that the term "process," as used in § 1500, encompasses "the entire course of legal proceedings" following the filing of a "suit"); *Beberman v. United States*, 135 Fed. Cl. 336, 340 (2017), *rev'd on other grounds*, 755 F. App'x. 973 (Fed. Cir. 2018).  And if an appeals court through its mandate remands a case for further proceedings, the ongoing "suit or process" remains "pending" until the lower court resolves the matter.  *Burman v. United States*, 75 Fed. Cl. 727, 729 (2007).  Viewed collectively, these cases instruct that the finality of the claim in the earlier-filed suit should be the focus for determining whether the same claim in the later-filed suit is barred.  Here, the claim against the Government in the Nevada Case was not extinguished by the district court's final judgment because once the Ayer group filed its notice of appeal the "suit or process" continued in the Ninth Circuit Appeal.

Just as in the Nevada Case, the claims at issue in the Ninth Circuit Appeal were *against the United States*.  The substance of the Ninth Circuit's decision reveals as much.  Specifically, the Circuit reviewed whether the district court had subject-matter jurisdiction over Plaintiff's claims against the BIA pursuant to the Administrative Procedure Act, answering the question in the

negative due to a lack of final agency action. *Winnemucca*, 819 F. App'x at 482 (holding that "at the time the complaint was filed the [BIA] had not reached a final decision on whether it would recognize any group as the Colony's tribal council, or whether any such recognition was warranted"). Although the Government was not directly engaged in the appeal, it was still subject to the judgment of the Ninth Circuit and faced the potential of continued proceedings in the district court if the Circuit had remanded for further proceedings. In short, whether the Government was directly litigating the Ninth Circuit Appeal is irrelevant. Because the claims asserted in the Nevada Case were against the Government and the same claims were being challenged in the Ninth Circuit Appeal, the appeal constituted a "suit or process" pending "against the United States" under the meaning of § 1500. *See Scott Aviation v. United States*, 23 Cl. Ct. 573, 576 (1991) (dismissing complaint under § 1500 where same claim previously brought in this court was then-pending on appeal before the Federal Circuit).

This conclusion is reinforced by the purpose of § 1500. The jurisdictional bar now found in § 1500 dates to the Reconstruction Era and was enacted to address suits brought against the United States by former residents of the Confederacy to recover for property seized during the Civil War. *Keene*, 508 U.S. at 206. Many claimants who struggled to bring suit in the Court of Claims, which barred the claims of plaintiffs who aided the rebellion, brought duplicative suits in other courts. *Id.* (citing Schwartz, *Section 1500 of the Judicial Code and Duplicate Suits Against the Government and Its Agents*, 55 Geo. L.J. 573, 574–80 (1967)). Thus, Congress passed the progenitor of § 1500 "to prohibit the filing and prosecution of the same claims against the United States in two courts at the same time." *Johns-Manville Corp. v. United States*, 855 F.2d 1556, 1562 (Fed. Cir. 1988). The purpose of the jurisdictional bar was to avoid not only the "unfair burden to the defendant" but also "[t]he possibility of inconsistent judicial resolution of similar

legal issues[,] . . . unnecessary crowding of this court's docket[,] and general administrative chaos." *Id.* at 1563 (quoting *City of Santa Clara v. United States*, 215 Ct. Cl. 890, 893 (1977)). Accordingly, barring Plaintiff's claims here properly upholds the purpose of § 1500.

For these reasons, the Court finds that it lacks jurisdiction over Counts One through Eight, Ten, and Eleven pursuant to § 1500.

## II.     Plaintiff Has Failed to Identify Violations of Money-Mandating Fiduciary Duties in Counts Three, Four, Seven, and Part of Count Six.

In addition to its § 1500 argument, the Government alleges that Counts Three through Seven should be dismissed because each of the counts fails to allege that the Government violated a money-mandating fiduciary duty. ECF No. 23 at 42. Accordingly, the Government argues the Court lacks jurisdiction over those claims. *Id.* The Court concludes Plaintiff has sufficiently identified money-mandating statutes granting the Court jurisdiction over Count Five and part of Count Six. Plaintiff has not identified, however, money-mandating statutes supporting Counts Three, Four, Seven, and part of Count Six.

Plaintiff alleges the Court has subject-matter jurisdiction over its claims pursuant to the Tucker Act, 28 U.S.C. § 1491, and Indian Tucker Act, 28 U.S.C. § 1505. These acts provide for a limited waiver of the Government's sovereign immunity, granting the Court jurisdiction over (1) any claim against the United States founded either upon the Constitution, or any Act of Congress or any regulation of an executive department, or upon any express or implied contract with the United States," *id.* § 1491(a)(1); and (2) any claim against the United States in favor of a tribe "arising under the Constitution, laws or treaties of the United States, or Executive orders of the President, or [that] is one which otherwise would be cognizable in the Court of Federal Claims if

14

the claimant were not an Indian tribe, band or group," *id.* § 1505.[3]  The acts, however, are purely jurisdictional and do not create "a substantive right enforceable against the Government by a claim for money damages."  *United States v. White Mountain Apache Tribe*, 537 U.S. 465, 472 (2003). To establish jurisdiction, the plaintiff must identify a substantive source of law, distinct from the Tucker Act or Indian Tucker Act, that satisfies a two-part test outlined by the Supreme Court. *United States v. Navajo Nation* (*Navajo II*), 556 U.S. 287, 290–91 (2009).

Under that test, the tribe first "'must identify a substantive source of law that establishes specific fiduciary or other duties and allege that the Government has failed faithfully to perform those duties.'"  *Id.* at 290 (quoting *United States v. Navajo Nation* (*Navajo I*), 537 U.S. 488, 506 (2003)).  "[A] statute or regulation that recites a general trust relationship between the United States and the Indian People is not enough to establish any particular trust duty."  *Hopi Tribe v. United States*, 782 F.3d 662, 667 (Fed. Cir. 2015).  Rather, "the analysis must train on specific rights-creating or duty-imposing statutory or regulatory prescriptions."  *Navajo I*, 537 U.S. at 506.

Next, the tribe must demonstrate that "the relevant source of substantive law can fairly be interpreted as mandating compensation for damages sustained as a result of a breach of the duties [the governing law] impose[s]."  *Navajo II*, 566 U.S. at 291 (alteration in original) (internal quotation marks omitted) (quoting *Navajo I*, 537 U.S. at 506).  A statute is money-mandating in two circumstances: when (1) "it can fairly be interpreted as mandating compensation by the Federal Government for . . . damages sustained," or (2) "it grants the claimant a right to recover damages either expressly or by implication."  *Lummi Tribe of the Lummi Rsrv. v. United States*,

---

[3] The last clause of the Indian Tucker Act is meant to incorporate the "ordinary" Tucker Act.  *United States v. Navajo Nation* (*Navajo II*), 556 U.S. 287, 290 (2009).

870 F.3d 1313, 1317 (Fed. Cir. 2017) (internal quotation marks and numbering omitted) (quoting *Blueport Co., LLC v. United States*, 533 F.3d 1374, 1383 (Fed. Cir. 2008)).

A statute need not explicitly mandate money damages, and "general trust law [may be] considered in drawing the inference that Congress intended damages to remedy a breach of obligation." *White Mountain Apache Tribe*, 537 U.S. at 477.  However, should the statutes or regulations relied upon to satisfy the question of jurisdiction grant officials "substantial discretion" in carrying out the statutory scheme, they generally cannot be interpreted as mandating compensation.  *Wolfchild v. United States*, 731 F.3d 1280, 1292 (Fed. Cir. 2013) (internal quotation marks and citation omitted); *Doe v. United States*, 463 F.3d 1314, 1324 (Fed. Cir. 2006) ("A statute is not money-mandating when it gives the government complete discretion over the decision whether or not to pay an individual or group." (citation omitted)).

### A.    Plaintiff Has Not Identified a Money-Mandating Source of Law Underlying Count Three.

Plaintiff argues that the executive order that created the Winnemucca reservation ("Executive Order") in conjunction with the *Winters* doctrine provides the money-mandating source of law underlying Count Three.  ECF No. 25 at 35–36.  In that claim, Plaintiff alleges the Government wrongfully allowed the Offenhauser Development Company to divert water from Colony lands in breach of its fiduciary duty to prevent third-party interference with the Colony's reserved waters rights.  ECF No. 22 ¶¶ 164, 168–70; *see* ECF No. 25 at 37.

In *Winters v. United States*, the federal government filed an action to enjoin defendant-corporations from constructing or maintaining dams or reservoirs on the Milk River in Montana, which constituted the northern boundary of the Fort Belknap Indian Reservation, or from otherwise preventing water of the river from flowing to the reservation.  207 U.S. 564, 565 (1908).  The Supreme Court held that when the Government set aside the Fort Belknap Indian Reservation by

treaty, it reserved for the Indians enough water from the Milk River to support an agrarian lifestyle. *Id.* at 577. Accordingly, the Court upheld the lower court's order enjoining any diversions of the Milk River upstream of the reservation that would render the reservation inarable. *Id.* at 578 ("The power of the government to reserve the waters and exempt them from appropriation under the state laws is not denied, and could not be."). *Winters* thus stands for the principle that "a reservation of water rights sufficient to accomplish the purpose of the reservation is made when the Government reserves land for a reservation or other federal enclave." *White Mountain Apache Tribe of Ariz. v. United States*, 11 Cl. Ct. 614, 626 (1987), *aff'd*, 5 F.3d 1506 (Fed. Cir. 1993).

Plaintiff argues that in *Hopi Tribe* the Federal Circuit recognized that the *Winters* doctrine imposes fiduciary duties on the Government. ECF No. 25 at 36 (citing *Hopi Tribe*, 782 F.3d at 669). In that case, the Hopi Tribe sued the Government for failing to protect the reservation's water supply from contamination by toxic chemicals. *Hopi Tribe*, 782 F.3d at 665–66. The tribe argued that the Government breached its fiduciary duty under the *Winters* doctrine to preserve the reservation's water quality. *Id.* at 669. The Court held that the *Winters* doctrine "gives the United States the power to exclude others from subsequently diverting waters that feed the reservation" and that in some circumstances "it may also give the United States the power to enjoin others from practices that reduce the quality of water feeding the reservation." *Id.* The Court held the doctrine did not "give the United States responsibility for the quality of water within the reservation, independent of any third-party diversion or contamination." *Id.* According to the Court, "[a]t most, . . . Congress accepted a fiduciary duty to exercise [reserve water] rights and exclude others from diverting or contaminating water that feeds the reservation." *Id.*

While the United States' duties regarding third-party water diversions are central to this case, they were not in *Hopi Tribe* and the quoted statement generally refers to the existence of a

duty in a best-case scenario.  Because it was not necessary for the resolution of the issue in *Hopi Tribe*, it constitutes dicta.  Lower courts have not interpreted *Hopi Tribe* to decide definitively that the Government owes tribes any specific fiduciary duties with respect to third-party water diversion, instead analyzing the text of specific sources of law to determine the existence of duties related to reserved water rights.  *See Ute Indian Tribe of Unitah v. United States*, No. 18-359 L, 2021 WL 1602876, at *4–6 (Fed. Cl. Feb. 12, 2021), *appeal docketed*, No. 21-1880 (Fed. Cir. Apr. 23, 2021); *Crow Creek Sioux Tribe v. United States*, 132 Fed. Cl. 408, 411 (2017), *aff'd*, 900 F.3d 1350 (Fed. Cir. 2018).

Importantly, after the parties completed briefing on the Government's Motion, the Supreme Court decided *Navajo Nation*, holding that an 1868 treaty with the Navajos did not impose upon the federal government a duty to take affirmative steps to secure water for the tribe, even if under the *Winters* doctrine the treaty reserved the tribe's water rights.  143 S. Ct. at 1811, 1814.  In that case, the Navajos were not alleging that the Government had interfered with water access but that it should assess, plan, and provide for the tribe's water needs.  *Id.* at 1810.  The Court held that, although the treaty creating the Navajo reservation imposed several specific duties on the United States, "the treaty said nothing about any affirmative duty for the United States to secure water." *Id.* at 1813.   Specifically, the Court found no language in the Navajo treaty that would establish a "conventional trust relationship with respect to water."  *Id.* at 1814 (explaining that the Court would not "'apply common-law trust principles' to infer duties not found in the text of a treaty, statute, or regulation").  As "it is not the Judiciary's role to update the law," the Court concluded its must leave "to Congress and the President the responsibility to enact appropriations laws and to otherwise update federal law as they see fit in light of the competing contemporary needs for water."  *Id.* at 1814–15.

Here, the source of law setting aside the Colony's land is contained in a single paragraph of an executive order.  The Executive Order states:

> It is hereby ordered that the following lands in Nevada be, and they are hereby reserved from entry, sale or other disposal and set aside for the use of two certain bands of homeless Shoshone Indians now residing near the towns of Winnemucca and Battle Mountain, Nevada.

President Woodrow Wilson, Executive Order of June 18, 1917.  Like the Navajo treaty, there is no language in the Executive Order through which a trust relationship regarding water could be inferred.  Indeed, the order is completely silent with respect to water.  Just as the Supreme Court found the Navajo treaty did not impose a duty to take "affirmative steps" to secure water for the Navajo Tribe, the Court also concludes the Executive Order does not impose a duty on the Government to take "affirmative steps" to prevent diversion of water onto the Winnemucca reservation. *Navajo Nation*, 143 S. Ct. at 1814.  That *Winters* nonetheless recognizes the Colony's reserved water rights does not in itself create a duty for the Government to enforce those rights against third-party interference.  *Winters* only recognized the federal government's power to assert such rights on behalf of a tribe, not that it has a specific fiduciary duty to do so.  *Navajo Nation* instructs that neither the Government's general trust relationship with the Colony nor the Executive Order fill in the gap to create an affirmative duty to ensure the Colony's access to water.  Indeed, *Navajo Nation* rejected the argument that the Government's purported control over reserved water rights created trust duties to the Navajos and indicated that the Navajos could assert their own interests in water rights litigation.[4]  *Navajo Nation*, 143 S. Ct. at 1815–16.

---

[4] As noted above, reserved water rights cases in this court have employed a similar analytical framework.  In *Ute Indian Tribe*, a tribe brought a breach of trust claim premised on, among other things, the Government's failure to prevent trespass theft and conversion of the tribe's reserved water rights.  2021 WL 1602876, at *3 n.3.  In *Crow Creek Sioux*, a tribe brought a similar claim based on the Government's diversion of water from the Missouri River through the construction of several dams.  132 Fed. Cl. at 409.  In each case, the courts looked to the language

Plaintiff argues that *Navajo Nation* is inapposite because Plaintiff's claims are not premised on the treaty with the Navajos analyzed in that case. ECF No. 26 at 2. Nevertheless, since both the Navajo treaty and the Executive Order make no mention of any affirmative duty respecting water, the analytical framework laid out by the Supreme Court compels the same conclusion in both cases. Plaintiff also argues that *Navajo Nation* is inapplicable since it did not overrule *Winters*. But while the Supreme Court did not overrule the earlier precedent, the Court here must nevertheless follow the Supreme Court's guidance in analyzing cases involving the *Winters* doctrine, and that guidance leads the Court to conclude that neither the *Winters* doctrine nor the Executive Order impose the trust responsibilities Plaintiff asserts here.

Because the Executive Order does not impose a duty upon the Government to prevent third-party diversion of water onto Colony lands or otherwise take affirmative steps to secure water for Colony lands, it is not a money-mandating source of law that can support jurisdiction in this case. And because Plaintiff has not identified an otherwise money-mandating source of law underlying Count Three, the Court does not have jurisdiction to hear such claim under the Tucker Act or Indian Tucker Act.

## B. Plaintiff Has Not Identified a Money-Mandating Source of Law Underlying Count Four.

Plaintiff alleges that the Native American Housing Assistance and Self-Determination Act ("NAHASDA"), 25 U.S.C. §§ 4101–4243, provides the money-mandating source of law underlying Count Four. ECF No. 25 at 39. In that count, Plaintiff claims that the Government

---

of the sources of law at issue to determine whether they imposed specific trust obligations with respect to water, and they found none. *Ute Indian Tribe*, 2021 WL 1602876, at *4–6; *Crow Creek Sioux*, 132 Fed. Cl. at 409, 411 (noting treaties establishing reservations did not address water rights; holding general trust language in statute to manage natural resources, alongside *Winters*, did not create specific trust obligations sufficient to invoke jurisdiction under the Indian Tucker Act).

wrongly conveyed leaseholds for residential housing on Colony land to nonmembers without collecting rents, excluded Colony members from Colony lands, and prevented the Colony from applying for housing grants.  ECF No. 22 ¶¶ 174–79.  As a result, Plaintiff alleges it suffered over $20,000,000 in damages.  *Id.* ¶ 179.

NAHASDA directs the Government to provide grants to Indian tribes to carry out affordable housing activities.  25 U.S.C. § 4111(a).  Plaintiff does not allege that it made an application for grants, and accordingly does not allege the Government failed to provide grants owed under a NAHASDA contract.  ECF No. 22 ¶ 179.  Rather, it alleges that, without a recognized tribal government, it lacked the ability to enter into contracts or receive grants under NAHASDA and thus is seeking to recover the amount of funding it should have received.  *Id.* ¶ 176; ECF No. 25 at 40.

The Federal Circuit has held that the obligation imposed by NAHASDA to supply tribes with housing grants is not money-mandating.  *Lummi Tribe*, 870 F.3d at 1319.  As the Court explained, "[u]nder NAHASDA, the Tribes are not entitled to an actual payment of money damages, in the strictest terms."  *Id.* at 1318.  Rather, the Court held that the appropriate remedy for a failure to allocate or disburse funds under NAHASDA is the award of "strings-attached NAHASDA grants—including subsequent supervision and adjustment," which is a form of equitable relief.  *Id.*

Plaintiff responds that it "is not seeking equitable relief in the form of strings-attached NAHASDA grants . . . .  It is seeking money damages because it never received the funding it was due."  ECF No. 25 at 40.  But the Federal Circuit has specifically rejected such a distinction.  *Lummi Tribe* held that any claim for relief under NAHASDA for a failure to provide housing grants "would necessarily be styled in the same [equitable] fashion; the statute does not authorize a free

and clear transfer of money." 870 F.3d at 1319. Thus, NAHASDA cannot serve as the money-mandating source of law underlying Count Four, and the Court therefore lacks jurisdiction to hear such claim under the Tucker Act or Indian Tucker Act.

    **C.**    **Plaintiff Has Identified a Money-Mandating Source of Law Underlying Count Five.**

Plaintiff's Amended Complaint asserts that the Indian Non-Intercourse Act, 25 U.S.C. § 177, provides the money-mandating source of law underlying Count Five. ECF No. 22 ¶¶ 181–82. In its Opposition, Plaintiff alleges that the Indian Long-Term Leasing Act, 25 U.S.C. § 415, and its implementing regulations, 25 C.F.R. §§ 162.005 and 162.023, provides a further basis for jurisdiction. ECF No. 25 at 41, 45–46. Count Five alleges the Government wrongfully conveyed a possessory interest in Colony lands to nonmembers, allowed various encroachments on Colony lands without the Colony's consent, and allowed the diversion of a stream which prevented water from entering Colony lands. ECF No. 22 ¶¶ 190–91. The Court concludes that the Indian Long-Term Leasing Act, but not the Indian Non-Intercourse Act, is a money-mandating source of law that may form a jurisdictional basis of Count Five.

        1.   <u>Plaintiff Has Not Established That the Indian Non-Intercourse Act Is a Money-Mandating Source of Law.</u>

The only substantive source of law that Plaintiff identifies in Count Five of the Amended Complaint is the Indian Non-Intercourse Act. *Id.* ¶ 181. The Non-Intercourse Act states:

> No purchase, grant, lease, or other conveyance of lands, or of any title or claim thereto, from any Indian nation or tribe of Indians, shall be of any validity in law or equity, unless the same be made by treaty or convention entered into pursuant to the Constitution. Every person who, not being employed under the authority of the United States, attempts to negotiate such treaty or convention, directly or indirectly, or to treat with any such nation or tribe of Indians for the title or purchase of any lands by them held or claimed, is liable to a penalty of $1,000. The agent of any State who may be present at any treaty held with Indians under the authority of the United States, in the presence and with the approbation of the commissioner of the

United States appointed to hold the same, may, however, propose to, and adjust with, the Indians the compensation to be made for their claim to lands within such State, which shall be extinguished by treaty.

25 U.S.C. § 177.

Plaintiff relies on two decisions by the Court of Claims that found the Non-Intercourse Act imposes fiduciary duties on the Government.[5]  In *Seneca Nation of Indians v. United States*, the Court of Claims held that "[i]n the light of [the Non-Intercourse Act's] language, contemporaneous construction, and history, . . . the United States assumed a special responsibility to protect and guard against unfair treatment in [transactions for the disposition of tribal land]."  173 Ct. Cl. 917, 925 (1965).  And in *United States v. Oneida Nation of New York*, the Court "re-affirm[ed] previous decisions that held that the Trade and Intercourse Act establishes a fiduciary relationship between the Indians and the United States Government."  477 F.2d 939, 943 (Ct. Cl. 1973).  Other cases that are not binding on this Court have likewise recognized a fiduciary relationship created by the Non-Intercourse Act.  *See Joint Tribal Council of the Passamaquoddy Tribe v. Morton*, 528 F.2d 370, 379 (1st Cir. 1975) (holding Non-Intercourse Act created trust relationship between Government and tribes); *Alabama-Coushatta Tribe of Tex. v. United States*, Cong. Reference No. 3-83, 2000 WL 1013532, at *63 (Fed. Cl. June 19, 2000) (same); *but see Shinnecock Indian Nation v. United States*, 112 Fed. Cl. 369, 380 (2013) (holding Non-Intercourse Act did not "give rise to any specific fiduciary duties that are applicable to the judiciary"), *aff'd in part, vacated in part, remanded*, 782 F.3d 1345 (Fed. Cir. 2015).

*Seneca* and *Oneida*, however, were decided before the Supreme Court established the two-part test of *Navajo I* and *II* for determining jurisdiction over an Indian Tucker Act claim.  And both

---

[5] The Court of Claims is a predecessor to the Federal Circuit, and its decisions remain binding on this Court unless overturned by a higher court or by statute.  *S. Corp. v. United States*, 690 F.2d 1368, 1370 (Fed. Cir. 1982).

cases addressed a question of liability under the Non-Intercourse Act in conjunction with the Indian Claims Commission Act ("ICCA"). *Seneca*, 173 Ct. Cl. at 926 (holding the Non-Intercourse Act could support recovery of money damages under the ICCA when a tribe received "unconscionably low consideration" for the disposition of its land); *Oneida*, 477 F.2d at 941 (holding the Government "might be liable" for money damages under the ICCA if the Non-Intercourse Act created a fiduciary duty upon the Government regarding tribal land transactions).

Plaintiff has not invoked the ICCA here, nor could it, as the act only granted jurisdiction over claims accruing before August 14, 1946. 25 U.S.C. § 70a. The standard applied in *Seneca* and *Oneida* to determine if the courts had jurisdiction over the tribes' claims differs significantly from the standard this Court must apply. In those cases, the courts' jurisdiction was premised on subsection 2, clause 5 of the ICCA.[6] *Seneca*, 173 Ct. Cl. at 926; *Oneida*, 477 F.2d at 941. Clause 5 applied to "claims based upon fair and honorable dealings that are not recognized by any existing rule of law or equity." 25 U.S.C. § 70a(2)(5). The courts in both cases held that a "'special relationship' [was] established between the government and the claimant Indians affecting the controverted subject matter" based on the Non-Intercourse Act. *Oneida*, 477 F.2d at 942 (quoting *Lipan Apache Tribe v. United States*, 180 Ct. Cl. 487, 502 (1967)); *see Seneca*, 173 Ct. Cl. at 925–26. However, that conclusion was not driven by any particular text of the statute found to create specific fiduciary or other duties of the Government that are money-mandating. Rather, the courts cited to a speech by President George Washington to the Seneca tribe expounding on the Act. *Oneida*, 477 F.2d at 941–42 (emphasis omitted) ("The General Government will never consent to

---

[6] In *Seneca*, the court held it also had jurisdiction over the plaintiff's claims under clause 3 of subsection 2, 173 Ct. Cl. at 925–26, which applies to certain claims arising from "treaties, contracts, and agreements between the claimant and the United States," 25 U.S.C. § 70a(2)(3). Here, Plaintiff's claims are not premised on any agreement between it and the United States.

your being defrauded, but it will protect you in all your just rights . . . . [Y]ou will perceive, by the law of Congress for regulating trade and intercourse with the Indian tribes, the fatherly care the United States intend to take of the Indians."); *see Seneca*, 173 Ct. Cl. at 923–24.

Under the standards applicable to this Court, the recitation of a "general trust relationship" is insufficient to establish jurisdiction over a breach of trust claim. *Hopi Tribe*, 782 F.3d at 667. Furthermore, the Colony "must establish, among other things, that *the text* of a treaty, statute, or regulation imposed certain duties on the United States." *Navajo Nation*, 143 S. Ct. at 1813 (emphasis added). The jurisdictional analyses of *Oneida* and *Seneca* are simply inapplicable to the Court's current standards. Plaintiff has pointed to no other authority that has held the Non-Intercourse Act imposes specific fiduciary duties on the Government that are money-mandating and only asserts without any argument that *Seneca* and *Oneida* "would survive analysis under *White Mountain Apache II*." ECF No. 25 at 44.

With no binding precedent applicable to the jurisdictional question at hand, the Court concludes that under the standard laid out in *Navajo I*, the text of the Non-Intercourse Act does not impose any "specific fiduciary or other duties" on the United States. *Navajo I*, 537 U.S. at 506. The statute lays out three requirements that: (1) any conveyance of tribal land must be made through treaty pursuant to the Constitution; (2) any private party who attempts to enter such a treaty is liable for $1,000; and (3) a state may, with the approval of the United States, adjust the terms of treaties that convey tribal land held within its jurisdiction. 25 U.S.C. § 177. The Act thus grants the Government certain *powers* in the facilitation of tribal land conveyances—to enter treaties, to penalize private individuals who attempt to acquire tribal land, and to allow participation by the states—but nothing in the text places upon the Government a *duty* to carry out any specific function. Because the Indian Non-Intercourse Act fails the first prong of the *Navajo*

*I* analysis, the Court concludes it is not a money-mandating source of law and cannot support jurisdiction in this case.

      2.   <u>The Indian Long-Term Leasing Act Is a Money-Mandating Statute Granting the Court Jurisdiction Over Count Five.</u>

The Federal Circuit in *Brown v. United States* held that the Indian Long-Term Leasing Act and its implementing regulations impose on the Government money-mandating fiduciary duties in the tribal leasing context.  86 F.3d 1554, 1563 (Fed. Cir. 1996).  The Government admits as much but argues that because Plaintiff did not identify the Act in its Amended Complaint, it cannot raise the statute for the first time in its opposition brief.[7]  ECF No. 28 at 26–27 (citing *Jarvis v. United States*, 154 Fed. Cl. 712, 718–19 (2021)).

A plaintiff need not identify explicitly in its Complaint a money-mandating source of law underlying its claims so long as "there are facts pleaded in the complaint from which the court's jurisdiction may be inferred."  *Gay v. United States*, 93 Fed. Cl. 681, 685 & n. 4, 5 (2010) (quoting 5B Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 1350 (3d ed. 2022)) (allowing claim to move forward despite failure to identify money-mandating statute creating jurisdiction in complaint when relevant statute was readily identifiable); *see, e.g., Ward v. United States*, 89 Fed. Cl. 463, 475 (2009) (same); *Morganroth v. Quigg*, 885 F.2d 843, 846 (Fed. Cir. 1989) (holding plaintiff need not refer in complaint to statute granting court jurisdiction over claims grounded in patent law when claims were clearly based on patent law violations).

---

    [7] In its Reply, the Government associates Plaintiff's reference to the Indian Long-Term Leasing Act with the claims under Count Six, *see* ECF No. 28 at 26, but Plaintiff discussed the act under its Count Five argument, *see* ECF No. 25 at 45.

The Indian Long-Term Leasing Act requires the Government to approve leases of Indian land, *Brown*, 86 F.3d at 1562, and "ensure that the parties to a lease of Indian land have given adequate consideration to the impacts of the lease on, *inter alia*, neighboring lands and the environment," *Nulankeyutmonen Nkihtaqmikon v. Impson*, 503 F.3d 18, 29 (1st Cir. 2007). The Act's protections are meant to encompass both Indian tribes and their members. *Id.* It can thus be inferred from the facts alleged throughout the Amended Complaint—*i.e.*, that the Government gravely mismanaged the leasing of residential properties on the Colony's land, including failing to collect any rent—that the Indian Long-Term Leasing Act supplies a money-mandating source of law underlying Count Five to that extent. Indeed, the Federal Circuit has drawn a connection between the Act and the Non-Intercourse Act, cited in Count Five, explaining that the former "must, of course, be understood against the backdrop created by [the latter], the most general prohibition on conveyances of interests in Indian land." *Brown*, 86 F.3d at 1562.

Because there is a money-mandating source of law underlying Count Five, the Court concludes it does not lack jurisdiction over such claim solely based on the failure to identify that specific money-mandating source of law.[8]

### D.     Plaintiff Has Identified a Money-Mandating Source of Law Supporting Only Part of Count Six.

Plaintiff identifies 25 U.S.C. § 323, NAHASDA, and the Indian Non-Intercourse Act as the money-mandating sources of law underlying its breach of fiduciary duty claim in Count Six. ECF No. 22 ¶ 199; *see* ECF No. 25 at 47. In support of its claim, Plaintiff alleges that the Government failed to survey Colony lands as requested by the Colony; failed to prevent encroachments on Colony lands, including a garage, shed, trailer park, road, and driveway;

---

[8] As explained in other sections of this opinion, the Court nonetheless lacks jurisdiction over Count Five for other reasons.

interfered with the Colony's efforts to reopen the smoke shop; and failed to recognize a tribal council for the Colony.  ECF No. 22 ¶¶ 195–96, 199.

As explained above, Plaintiff has not demonstrated that NAHASDA and the Non-Intercourse Act are money-mandating statutes.  The Government concedes that Plaintiff's remaining source of law, 25 U.S.C. § 323, "may create money-mandating fiduciary duties."  ECF No. 28 at 26 n.9; *see Mitchell II*, 463 U.S. at 223 (recognizing § 323 and related statutes as money-mandating).  It argues, however, that "Plaintiffs' passing reference to 25 U.S.C. [§] 323 in Count Six does not create a plausible claim for relief."  ECF No. 28 at 26 n.9.  It also argues Plaintiff has not identified a source of law creating a money-mandating duty to recognize a tribal government and that no such duty exists.  ECF No. 23 at 47 (quoting *Cayuga Indian Nation of N.Y. v. E. Reg'l Dir.*, 58 IBIA 171, 179, 2014 WL 264822, at *6 (Jan. 16, 2014)).  Plaintiff does not dispute the Government's contention that no statute or regulation requires the BIA to recognize a tribal council.  Rather, Plaintiff rejects the Government's characterization of its allegations, arguing that its "claim is not about failure to recognize a legitimate tribal government."  ECF No. 25 at 48.

The Court has jurisdiction over a claim under the Tucker Act or Indian Tucker Act so long as the plaintiff has identified a money-mandating source of law underlying the claim and demonstrated that it is "within the class of plaintiffs entitled to recover under the money-mandating source."  *Jan's Helicopter Serv., Inc. v. F.A.A.*, 525 F.3d 1299, 1307 (Fed. Cir. 2008).  Section 323 provides the Secretary of the Interior the power to grant rights-of-way over Indian lands, and tribes such as Plaintiff fall under the class of plaintiffs entitled to relief under the provision.  Therefore, the Court concludes that it is not deprived of jurisdiction over Count Six based on a lack of an identified money-mandating source of law.

Nevertheless, if a "plaintiff's case does not fit within the scope of the [money-mandating source of law,] . . . plaintiff loses on the merits for failing to state a claim on which relief can be granted." *Id.* (quoting *Fisher v. United States*, 402 F.3d 1167, 1175–76 (Fed. Cir. 2005)). Plaintiff's contentions in Count Six regarding surveying, recognition of a tribal government, and the smoke-shop operation are patently unrelated to the Secretary of the Interior's power to grant rights-of-way. That the Government failed to compensate the Colony for rights-of-way resulting in the physical encroachments alleged in Count Six, however, could plausibly entitle Plaintiff to relief. *See Mitchell II*, 463 U.S. at 223. The Court thus concludes that Count Six should be dismissed in part for failure to state a claim upon which relief can be granted to the extent the claim rests on allegations other than those related to physical encroachments onto Colony lands.[9]

### E.   Plaintiff Has Not Identified a Money-Mandating Source of Law Underlying Count Seven.

As the Government correctly argues, Plaintiff has not identified any money-mandating source of law underlying Count Seven. ECF No. 23 at 47. In that count, Plaintiff simply alleges that it has "no other remedy at law or administrative appeal to recover the value of the loss of their lands and sovereignty" resulting from the Government's numerous alleged breaches of trust and violations of law. ECF No. 22 ¶ 204. Plaintiff makes no argument in defense of jurisdiction, which the Court construes as a concession of the issue. *See Winnemucca Indian Colony*, 2014 WL 3107445, at *1 n.3. Since Plaintiff has admittedly failed to identify a money-mandating source of law underlying Count Seven, the Court concludes it lacks jurisdiction to hear such claim.

---

[9] As explained in other sections of this opinion, the Court nonetheless lacks jurisdiction over Count Six for other reasons.

### III.    Count One, Part of Count Two, and Counts Three through Six Are Barred by the Statute of Limitations.

The Government contends Count One, part of Count Two,[10] and Counts Three through Six should be dismissed as untimely under the court's statute of limitations, as each of these claims accrued more than six years before Plaintiff filed the Original Complaint.  ECF No. 23 at 36.  The Government attached a series of maps, deeds, satellite photos, and other documents to its Motion in support of its contention.  ECF No. 23, Exs. 15–25.  Through these exhibits, as well as the Colony's complaint in the 2013 Court of Federal Claims case ("2013 Complaint"), the Government aims to show that various encroachments and other events on the Colony's lands, which serve as the basis for claims in the Amended Complaint, existed over six years before Plaintiff filed suit and that Plaintiff was aware or should have been aware of them at that time.  ECF No. 23 at 38–41.

Plaintiff does not contest the validity of any evidence introduced by the Government but argues that the statute of limitations nevertheless does not bar its claims for several reasons—*i.e.*, because (1) the Government has not repudiated its trust relationship with the Colony, (2) the Government has not provided the Colony with an accounting, (3) the Wasson group was not recognized as the Colony's leadership until 2014, and (4) the continuing claims doctrine saves its claims.  ECF No. 25 at 24.  None of Plaintiff's arguments are availing.

The Court's six-year statute of limitations on actions against the United States "is a jurisdictional requirement attached by Congress as a condition of the government's waiver of sovereign immunity and, as such, must be strictly construed."  *Hopland Band of Pomo Indians v.*

---

[10] As part of Count Two, Plaintiff alleges that a road was constructed alongside Colony lands in 2018.  ECF No. 22 ¶ 158.  The Government concedes that if Plaintiff is referring to a road different from Highland Road, then this allegation falls within the limitations period.  ECF No. 23 at 49.

*United States*, 855 F.2d 1573, 1576–77 (Fed. Cir. 1988). The limitations period begins to run when a "claim first accrues." 28 U.S.C. § 2501. The Federal Circuit has found that a claim ordinarily accrues "when all the events which fix the government's alleged liability have occurred and the plaintiff was or should have been aware of their existence." *San Carlos Apache Tribe v. United States*, 639 F.3d 1346, 1350 (Fed. Cir. 2011) (quoting *Hopland Band*, 855 F.2d at 1577). In the tribal breach-of-trust context, a claim accrues "when the trustee 'repudiates' the trust" and the Colony knows or should have known of that repudiation. *Shoshone Indian Tribe of Wind River Rsrv. v. United States*, 364 F.3d 1339, 1348 (Fed. Cir. 2004) (citations omitted) (citing *Hopland Band*, 855 F.2d at 1573); *see San Carlos Apache Tribe*, 639 F.3d at 1350. "A trustee may repudiate the trust by express words or by taking actions inconsistent with his responsibilities as trustee." *Shoshone Indian Tribe*, 364 F.3d at 1348. Courts employ an objective standard to determine whether a tribe knew or should have known that the United States repudiated its trust responsibilities. *San Carlos Apache Tribe*, 639 F.3d at 1350.

### A. The Amended Complaint Alleges the United States Has Repudiated Its Trust Relationship.

Plaintiff argues that the statute of limitations has not begun to run on its claims for breach of trust because the United States has not formally repudiated its trust relationship with the Colony, an essential step for claim accrual. ECF No. 25 at 24–25. A formal repudiation of the Government's role as trustee is unnecessary, however.

For the purposes of claim accrual, a repudiation simply means that "the trustee has failed to fulfill his responsibilities," which can occur "by express words or by taking actions inconsistent with his responsibilities as trustee." *Shoshone Indian Tribe*, 364 F.3d at 1348. Plaintiff alleged throughout its Amended Complaint that the United States breached its trust obligations to the Colony by failing to fulfill its responsibilities in myriad ways. *See, e.g.*, ECF No. 22 ¶¶ 158

31

(allowing construction of electrical substation, power lines, and road on Colony land without Colony approval), 168 (failing to prevent diversion of water onto Colony land), 174 (conveying housing to nonmembers without the collection of any payment), 199 (failing to recognize tribal council). Indeed, if Plaintiff did not make such allegations, then it would not have stated a claim for breach of trust in the first place, as a trustee's failure to fulfill his trust obligations is a required element of a *prima facie* claim for breach of trust. 121 AM. JUR. TRIALS 129 *Fiduciary Fraud* (2011); *Navajo I*, 537 U.S. at 506 (holding that the Government's failure "faithfully to perform [its fiduciary] duties" is an essential element of an Indian breach of trust claim).

Therefore, while the United States may not have formally repudiated its role as trustee to the Colony, Plaintiff has alleged through the Amended Complaint that the United States made limited, specific repudiations of its trust responsibilities. As further discussed below, these alleged repudiations determine when the statute of limitations period for each claim begins.

### B.   The United States Need Not Provide the Colony with an Accounting for the Limitations Period to Commence.

Plaintiff also contends that the limitations period has not commenced on its claims, and will not commence, until the United States provides the Colony with an accounting of BIA funds to determine the extent of the Colony's losses. ECF No. 25 at 25–26. Plaintiff bases its argument on two sources of law: (1) the common law of trusts, and (2) the Interior Department Appropriations Act of 2014. *Id.* at 25–27 (citing *Shoshone Indian Tribe*, 364 F.3d at 1348; Consolidated Appropriations Act, Pub. L. No. 113-76, 128 Stat. 5, 305–06 (Jan. 17, 2014)). The Federal Circuit has held that in tribal breach of trust cases it is "common for the statute of limitations to not commence to run against the beneficiaries until a final accounting has occurred that establishes the deficit of the trust." *Shoshone Indian Tribe*, 364 F.3d at 1348 (citing 76 AM. JUR. 2D *Trusts* § 440 (2000); *McDonald v. First Nat'l Bank of Bos.*, 968 F. Supp. 9, 14 (D. Mass.

1997)).   Congress codified this common-law principle through various Interior Department Appropriations Acts, most recently in 2014, which states: "the statute of limitations shall not commence to run on any claim . . . concerning losses to or mismanagement of trust funds, until the affected Indian tribe . . . has been furnished with an accounting of such funds from which the beneficiary can determine whether there has been a loss."  128 Stat. at 305–06.

Importantly, however, the 2014 Act tolled the statute of limitations applicable only to claims premised on "losses to or mismanagement of trust funds" for which an accounting would be necessary to determine "*whether* there has been a loss."  *Id.* (emphasis added).  It did not toll the limitations period for all breach of trust claims, and especially not those where the claimant alleged that "an open repudiation of an alleged trust duty" had already occurred.  *Wolfchild*, 731 F.3d at 1291 (holding tolling provision did not apply to case not involving trust funds and where accounting would not be necessary to put the tribe on notice of its claim).  In the latter scenario, as in this case, an accounting is not necessary to learn of the *existence* of a loss giving rise to a claim, although it could help show the *extent* of a loss.  Indeed, another judge of this court recently held that "if the Tribe is on notice of a breach of the government's trust obligations sufficient to state a claim—and simply is uncertain of the quantum of damages—the claim already has accrued and the statute of limitations has begun to run."  *Chemehuevi Indian Colony v. United States*, 150 Fed. Cl. 181, 202 (2020).  This holding finds support in longstanding binding precedent, as the Federal Circuit "has 'soundly rejected' the contention 'that the filing of a lawsuit can be postponed until the full extent of the damage is known.'"  *Navajo Nation v. United States*, 631 F.3d 1268, 1277 (Fed. Cir. 2011) (quoting *Boling v. United States*, 220 F.3d 1365, 1371 (Fed. Cir. 2000)).

Here, Plaintiff argues that "the true extent of the damage is unknown at this time" and "an accounting is necessary to calculate the extent of loss."  ECF No. 25 at 26, 28.  Plaintiff does not,

however, argue that an accounting is necessary to determine *whether* there has been a loss, nor would such argument be plausible. Plaintiff's claims involve alleged trust obligations pertaining to the Colony's lands and resources—not trust funds—and the Amended Complaint alleges that the Government committed "an open repudiation" of those alleged trust duties. *Wolfchild*, 731 F.3d at 1291. Therefore, an accounting is not necessary for accrual of Plaintiff's claims.

### C.   The Wasson Group Need Not Have Been Recognized for the Limitations Period to Commence.

Even assuming its claims had technically accrued, Plaintiff argues that the limitations period could not have commenced until December 13, 2014, when the BIA recognized the Wasson group as the Colony's duly elected council, as that is the earliest time the Wasson group could have been on inquiry notice of the Government's trust repudiations.[11]  ECF No. 25 at 27. As Plaintiff's Opposition expressly recognizes, however, "[t]here is only one Plaintiff—the Tribe." *Id.* at 21. It is the plaintiff's awareness of the facts fixing the Government's liability that determines when a claim accrues. *See San Carlos Apache Tribe*, 639 F.3d at 1350 (a claim accrues when "*the plaintiff* was or should have been aware of the[] existence" of "the events which fix the government's alleged liability" (emphasis added)). Whether Plaintiff—the Colony—was aware of the Government's alleged breaches of trust is not dependent on changes in or recognition of tribal leadership. *Cf. Wyandot Nation of Kan. v. United States*, 124 Fed. Cl. 601, 606 (2016) (holding limitations period on tribal breach of trust claim began when tribe became aware of breach

---

[11] Plaintiff's Opposition is confusing on this point. It argues that Plaintiff's claims did not accrue until December 13, 2020, which would be six years from the BIA's recognition of the Wasson group pursuant to an order in the Nevada Case. ECF No. 25 at 27; *see* ECF No. 22 ¶ 96 ("On December 13, 2014, the BIA in response to Court Order finally recognized the government of the Winnemucca Indian Colony."). Plaintiff likely meant that the statute of limitations did not *expire* until that date. The brief also erroneously refers to December 9, 2014, as the date of BIA's recognition.

in 1880s and thus successor-in-interest's claims were time-barred), *aff'd*, 858 F.3d 1392 (Fed. Cir. 2017).

Plaintiff has provided no caselaw supporting the proposition that the limitations period for a tribe does not commence until the tribal council that brings suit has been recognized by the BIA.[12] At best, Plaintiff's argument could be construed as a claim that the lack of a BIA-recognized council created a "legal disability" for the Colony that prevented it from filing an action, in which case § 2501 would entitle it to additional time to bring suit.  28 U.S.C. § 2501 ("A petition on the claim of a person under legal disability . . . at the time the claim accrues may be filed within three years after the disability ceases.").  But even assuming the lack of a recognized tribal council states a cognizable legal disability, the limited tolling provided under § 2501 would only extend the Colony's time to file an action until December 13, 2017 (three years after BIA's recognition of the Wasson group).

Accordingly, that the BIA did not recognize the Wasson group until December 13, 2014, does not save Plaintiff's claims from being time barred.

### D.    The Continuing Claims Doctrine Does Not Apply to Plaintiff's Claims.

In the same vein, Plaintiff asserts that the continuing claims doctrine preserves each of its claims despite the statute of limitations.  ECF No. 25 at 28.  When a plaintiff pleads "a series of distinct events—each of which gives rise to a separate cause of action—as a single continuing event," the continuing claims doctrine operates to save the later-arising claims even if the limitations period lapsed for the earlier-arising claims.  *Ariadne Fin. Servs. Pty. Ltd. v. United*

---

[12] By contrast, the Federal Circuit has held that a tribe's claim did not accrue until the tribe itself gained government recognition through judicial proceedings in another forum, as federal recognition or acknowledgement was a prerequisite to the tribe's right to statutory benefits, and thus a necessary element of the claim.  *Samish Indian Nation v. United States*, 419 F.3d 1355, 1369 (Fed. Cir. 2005).  Despite the leadership disputes, Plaintiff does not allege that the Colony's status as a federally recognized tribe was ever in question.  *See* ECF No. 22 ¶ 2.

*States*, 133 F.3d 874, 879 (Fed. Cir. 1998) (citing *Brown Park Estates–Fairfield Dev. Co. v. United States*, 127 F.3d 1449, 1456 (Fed. Cir. 1997)); *Friedman v. United States*, 310 F.2d 381, 384–85 (Ct. Cl. 1962)); *Rosales v. United States*, 89 Fed. Cl. 565 (2009) (holding continuing claims doctrine applies where "the last in a series of related, on-going actions falls within the six-year statute of limitations"). "In order for the continuing claim doctrine to apply, the plaintiff's claim must be inherently susceptible to being broken down into a series of independent and distinct events or wrongs, each having its own associated damages." *Wells v. United States*, 420 F.3d 1343, 1345 (Fed. Cir. 2005) (quoting *Brown Park*, 127 F.3d at 1456). "On the other hand, if there was only a single alleged wrong, even though the wrong caused later adverse effects, . . . the continuing claim doctrine is not applicable." *Id.* at 1345–46 (citing *Hart v. United States*, 910 F.2d 815 (Fed. Cir. 1990)).

## 1.   Plaintiff's Pleaded Claims Are Not Continuing Claims.

There are two categories of Plaintiff's claims that the Government argues are barred by the statute of limitations: (1) physical encroachments onto Colony land that the Government failed to address, ECF No. 22 ¶¶ 153–55, 158–61, 168–170, 191, 196–98; and (2) trespasses by nonmembers living on Colony land that the Government either wrongfully authorized and/or has failed to remedy through removal or eviction, *id.* ¶¶ 112, 174–78.

The Government's failures to prevent or prosecute physical encroachments onto Colony land, however, constitute "single distinct event[s]" that have only had "continued ill effects later on." *Simmons v. United States*, 71 Fed. Cl. 188, 192–93 (2006) (quoting *Brown Park*, 127 F.3d at 1456) (holding failure to prevent road construction on plaintiff's trust land did not constitute continuing claim). Likewise, the Government's allowing nonmembers to occupy Colony housing and failing to set proper rent rates, or its failure to remove trespassers living in unauthorized

housing, also constitute singular alleged wrongs even if the Colony continues to suffer from the consequences of the Government's original decisions.  *See Brown Park*, 127 F.3d at 1459 (holding failure to adjust rental payments was not continuing claim even when unsuitably low payments continued into limitations period); *Oenga v. United States*, 83 Fed. Cl. 594, 616 (2008) (same); *Simmons*, 71 Fed. Cl. at 192–93 (holding failure to prevent trespassers from entering trust land did not constitute continuing claim).

Take for example Plaintiff's claim that the Government wrongfully allowed a road to be constructed on Colony land.  ECF No. 22 ¶ 154.  According to the satellite imagery submitted by the Government, the road was constructed in 2013 at the latest.  *See* ECF No. 23-15.  Each day since then the road continues to exist, traffic may frequent upon it, and all the while Plaintiff lacks payment for the intrusion; however, these harms are the direct and natural result of the road's initial construction.  Or take Plaintiff's allegation that the Government unlawfully conveyed housing on the Colony's land to nonmembers and has refused the Colony's requests to remove trespassing individuals.  *See, e.g.*, ECF No. ¶¶ 33, 41, 64, 79, 82, 97–99, 174–78.  Again, while for decades the alleged trespassers have been ever present and the Colony has continuously lacked access to or benefits from Colony housing, such harm is the continued effect of the BIA's original decision to convey the housing to the alleged trespassers in 1997 and, with respect to any other individuals, to the Government's initial refusal to remove alleged trespassers dating back to at least 2011.  As aptly described in *Brown Park*, each of these claims arises from one alleged wrong by the Government, which accrued all at once, and the continuing harm alleged by Plaintiff results from the single earlier alleged wrong.  127 F.3d at 1457.  Accordingly, none of Plaintiff's claims in its Amended Complaint are part of "a series of independent and distinct events or wrongs," each with its own associated damages, and thus do not constitute continuing claims.  *Id.* at 1456.

2.   Plaintiff's Newly Raised Claims Are Not Continuing Claims.

In its Opposition, Plaintiff raises six allegations that it argues show a continuation of the Government's alleged wrongs.  ECF No. 25 at 29.  Specifically, Plaintiff alleges the Government: (1) removed Plaintiff from the budget formulation process; (2) failed to allocate all budget funds to the Colony; (3) failed to institute a tribal court for the Colony; (4) declined the Colony's application for law enforcement; (5) cut off communications with any Colony member except the Colony's chairwoman; and (6) denied the trust status of a parcel of Colony lands.  *Id.* at 30–34. All but one of these allegations do not appear in Plaintiff's Amended Complaint; and in any event, they do not save Plaintiff's untimely claims.

First, these allegations do not constitute continuing claims as they are not a continuation of the wrongs alleged in the Amended Complaint.  As a threshold matter, the continuing claims doctrine applies to save later arising claims in a series of *related* events or actions.  *Rosales*, 89 Fed. Cl. at 579; *see Friedman*, 310 F.2d at 384–85 (finding continuing claims doctrine applied to save later arising periodic pay claims); *Burich v. United States*, 366 F.2d 984, 986–87 (Ct. Cl. 1966) (same); *Mitchell v. United States*, 10 Cl. Ct. 787, 789 (1986) (holding continuing claims doctrine applied to save later-arising instances in a pattern of repeated failures to replant a harvested forest).  Except for the last allegation regarding the trust status of the Colony's land, Plaintiff's newly raised claims share no relation to the land- and natural resource-based claims pled in the Amended Complaint, but rather constitute entirely unique alleged wrongs.

Second, the more recent April 2015 denial of the trust status of the Colony's land, which in any event appears to have been formally reversed in August 2020 (ECF No. 22 ¶¶ 99, 102), is not a continuing claim.  BIA issued the denial in response to a tribal court order directing the eviction of the alleged trespassers to whom the Government, as described above, conveyed

residential housing in 1997 and/or whom the Government has refused to remove since at least 2011.  ECF No. 22 ¶¶ 33, 82, 97–99.  As of those earlier dates, all events necessary to fix the Government's alleged liability had occurred, and Plaintiff's claim accrued all at once.  *Brown Park*, 127 F.3d at 1459.

Finally, even if the Court found that Plaintiff's newly raised claims constitute a continuation of Plaintiff's claims as pled in the Amended Complaint, such that the continuing claims doctrine applied, the doctrine would act only to save the newly raised claims, not the claims in the Amended Complaint.  This is because the continuing claims doctrine serves to preserve those claims in a series of related events that occurred within the six-year statute of limitations period; it does not resurrect the related claims for which the limitations period has expired.  *Friedman*, 310 F.2d at 6–8; *Brown Park*, 127 F.3d at 1455–56; *Mitchell*, 10 Cl. Ct. at 789.

Because each of the claims in Counts One, part of Two, and Three through Six accrued outside of the limitations period, the continuing claims doctrine cannot save them regardless of the occurrence of later-arising claims.

### 3.  Plaintiff Should Not Be Permitted to Further Amend Its Complaint to Include the Newly Raised Claims.

Although Plaintiff's newly raised claims allegedly took place within the limitations period, it is axiomatic that Plaintiff cannot raise new allegations in its opposition brief to survive a motion to dismiss.  *Jarvis*, 154 Fed. Cl. at 718.  While Plaintiff incorrectly argues it did not need to include these allegations in its Amended Complaint, it alternatively requests leave to again amend its pleading.  ECF No. 25 at 29.  Under RCFC 15(a), the Court has discretion to allow a party to amend its complaint, and amendments should be liberally granted.  *Mitsui Foods, Inc. v. United States*, 867 F.2d 1401, 1403 (Fed. Cir. 1989).  Nevertheless, "'repeated failure to cure deficiencies

by amendments previously allowed . . . [or] futility of amendment' may justify the denial of a motion for leave to amend." *Id.* at 1403–04 (quoting *Foman v. Davis*, 371 U.S. 178, 182 (1962)).

Allowing Plaintiff to amend its Amended Complaint to include the newly raised claims would be futile, as this action is barred nearly in its entirety under § 1500. Moreover, Plaintiff's one-line cursory request for leave to amend does not attempt to state a plausible breach of trust claim, which must both identify a money-mandating source of law that establishes specific fiduciary duties and allege that the Government breached those duties.[13] *Navajo II*, 556 U.S. at 291. Plaintiff fails to identify any substantive source of law underlying its newly raised claims, which largely relate to decisions refusing or denying the Colony's Indian Self-Determination and Education Assistance Act ("ISDA") contract applications. *See* ECF No. 25 at 30–34; *see also Samish Indian Nation v. United States*, 419 F.3d 1355, 1365 (Fed. Cir. 2005) (holding that, absent a self-determination contract, "ISDA does not confer a private damage remedy" for non-payment of underlying benefits based on wrongful refusal to accord tribe federal recognition). Moreover, Plaintiff already had an opportunity to amend its Original Complaint once in response to the Government's first motion to dismiss, which raised similar statute of limitations arguments and, specifically, the continuing claims doctrine. *See* ECF No. 8 at 34–36.

### E. The Government Has Demonstrated That the Encroachments Alleged by Plaintiff Occurred Outside the Limitations Period.

Since Plaintiff has not demonstrated that the statute of limitations was tolled or has not begun to run, the Court must determine the accrual dates of its claims. Plaintiff bears the burden

---

[13] The Federal Circuit has found such bare requests for amendment to be insufficient. *See Refaei v. United States*, 725 F. App'x 945, 951 (Fed. Cir. 2018) (holding court was not required to address request to amend complaint "because it was merely incorporated into a response to a motion to dismiss"); *see also Albers v. Bd. of Cnty. Comm'rs of Jefferson Cnty., Colo.*, 771 F.3d 697, 706 (10th Cir. 2014).

of showing by a preponderance of the evidence that its encroachment and trespass claims accrued within the statute of limitations. *See Fid. & Guar. Ins. Underwriters*, 805 F.3d at 1087.  The alleged encroachments on tribal land include: (1) a street referred to as "Highland Road," ECF No. 22 ¶¶ 152–56, 191 (Counts One, Five); (2) an easement granted to a neighboring subdivision, *id.* ¶ 154 (Count One); (3) an electrical substation, *id.* ¶¶ 158, 160–62, 191 (Counts Two, Five); (4) overhead powerlines, *id.* ¶¶ 158–62, 191 (Counts Two, Five); (5) structures or wells that divert water from a stream bed or "remove water from wells from which water was able to reach the Colony's lands," *id.* ¶ 168; *see id.* ¶¶ 169–72, 191 (Counts Three, Five); and (6) structures placed by a neighboring subdivision, which include "a garage, shed, part of a trailer park, road, and driveway," *id.* ¶ 196 (Count Six).  The trespass claims relate to nonmembers residing in HUD housing on the Colony's land. *Id.* ¶¶ 174–78 (Count Four).

The Government submitted satellite images revealing that—as of 2013—Highland Road, the overhead powerlines, the ingress/egress for the neighboring subdivision, and the electrical substation were already constructed. *See* Exs. 15–19 to MTD, ECF Nos. 23-15, 23-16, 23-17, 23-18, 23-19.  The Government also submitted a 1989 map for development of a subdivision that reveals the existence of Highland Road at that time, Ex. 20 to MTD, ECF No. 23-20; a 1989 quitclaim deed for the overhead powerlines, Ex. 21 to MTD, ECF No. 23-21; a 1997 right-of-way application for the overhead powerlines, Ex. 22 to MTD, ECF No. 23-22; and a 1974 land survey that includes the electrical substation, Ex. 23 to MTD, ECF No. 23-23—all of which show that these structures were in place well before Plaintiff filed even its 2013 Complaint.

The Government also submitted satellite images of the Colony's residential 20-acre plot from 2013, which reveals the existence of a trailer park, road, driveway, sheds, and other structures. Ex. 24 to MTD, ECF No. 23-24.  While it cannot be certain, the Government believes

that these are the structures Plaintiff refers to in Count Six of its Amended Complaint at paragraph 196.  ECF No. 23 at 40.  Plaintiff also admitted in its Amended Complaint that alleged trespassers have occupied the 20 acres for decades, including at some point persons "living in makeshift, unhealthy and unauthorized housing."  ECF No. 22 ¶ 112; *see id.* ¶¶ 110, 113.  And Plaintiff acknowledged that the Government has refused to remove trespassers since as early as 2011, an allegation it also raised in the 2013 Complaint.  *Id.* ¶¶ 79–82; Ex. 9 to MTD ¶¶ 71–73, ECF No. 23-9.

Finally, the Government contends Plaintiff's description of the structures that divert water from Colony lands is too vague to determine the structures to which Plaintiff refers.  ECF No. 23 at 40.  Nevertheless, Plaintiff referred to an upstream subdivision's diversion of water in its 2013 Complaint.  ECF No. 23-9 ¶ 15.  As for the alleged trespassers in HUD housing on Colony land, the Amended Complaint alleges that the conveyances to those individuals occurred in 1997, which counsel confirmed at oral argument.  ECF No. 22 ¶¶ 33, 109–11; Tr. of Oral Arg. at 86:16–88:6, ECF No. 34.

Plaintiff does not dispute the veracity of any of this evidence, nor has Plaintiff presented any evidence to counter the Government's assertions.  Accordingly, the Court concludes Plaintiff has not met its burden to demonstrate that the allegations underlying Count One, part of Count Two, and Counts Three through Six occurred within six years prior to the filing of the Original Complaint.  To the contrary, the evidence presented by the Government and the allegations in the Amended Complaint and 2013 Complaint show they occurred outside the limitations period and that Plaintiff knew or should have known of the occurrences.  Therefore, each of these claims is time barred, and the Court accordingly lacks jurisdiction to entertain them.

**IV.    Counts Eight Through Eleven Request Equitable Relief That Is Outside of the Court's Jurisdiction.**

The Court likewise lacks jurisdiction over Counts Eight through Eleven because they seek equitable relief that is outside the Court's jurisdiction.  ECF No. 23 at 50.  Plaintiff argues that those claims should survive, as the Court has the authority under 28 U.S.C. § 1491(a)(2) to order equitable relief that will aid in a judgment of liability against the Government.  ECF No. 25 at 49.

Generally speaking, the Court lacks equity jurisdiction except in a few narrow circumstances.  *Nat'l Air Traffic Controllers Ass'n v. United States*, 160 F.3d 714, 716 (Fed. Cir. 1998).  One of those circumstances, which Plaintiff alleges is applicable here, is when equitable relief is "ancillary to claims for monetary relief over which [the Court] has jurisdiction."  *Id.* (citing 28 U.S.C. §§ 1491(a)(2), (b)(2)).  For example, once liability for money damages has been established, the Court may order an accounting to determine the extent of damages owed.  *N. Colo. Water Conservancy Dist. v. United States*, 88 Fed. Cl. 636, 665 (2009) (citing *Klamath & Modoc Tribes v. United States*, 174 Ct. Cl. 483, 490–91 (1966)); *Am. Indians Residing on Maricopa–Ak Chin Rsrv. v. United States*, 229 Ct. Cl. 167, 667 F.2d 980 (1981)).

Plaintiff's claims, however, do not invoke the Court's limited equitable powers.  Count Nine seeks a declaration that "the Colony is entitled to fair and reasonable compensation for past, present and future use of the Colony's water, land and other property rights."  ECF No. 22 ¶ 217.  In Count Ten, Plaintiff requests a declaration that "[Colony] members each suffered the loss of the use of the lands for twenty years and the benefits of tribal membership for fifteen years."  *Id.* ¶ 222.  And Count Eleven seeks a declaration that "[the Colony] is entitled to the opportunity to petition for the conveyance of the acreage in its purview."  *Id.* ¶ 228.  Each of these claims are standalone claims for declaratory judgment that are unnecessary and unrelated to any potential award of monetary relief.  *Nat'l Air Traffic Controllers*, 160 F.3d at 716 (holding the Court of

Federal Claims has no "jurisdiction to grant equitable relief when it is unrelated to a claim for monetary relief pending before the court."). They are thus outside the Court's jurisdiction.

Count Eight, on the other hand, is a demand for documents and an accounting to determine the amount of damages owed in relation to the claims pending before the Court. ECF No. ¶ 212. While the Court is permitted to require an accounting to aid in the assessment of damages, *see N. Colo. Water Conservancy*, 88 Fed. Cl. at 665, for the reasons stated above, each of Plaintiff's substantive counts must be dismissed. Because the Court lacks jurisdiction to entertain Plaintiff's claims, there are no damages to be assessed and therefore no accounting that would be "'an incident of and collateral to' a money judgment." *James v. Caldera*, 159 F.3d 573, 580 (Fed. Cir. 1998) (quoting 28 U.S.C. § 1491(a)(2)) ("[T]he Court of Federal Claims has no power to grant affirmative non-monetary relief unless it is tied and subordinate to a money judgment." (citation and quotation marks omitted)). Count Eight is thus outside the Court's jurisdiction.

## V. The Government Did Not Raise New Arguments in Its Reply That Warrant a Surreply.

In response to the Government's Reply, Plaintiff filed a Motion for Leave to File a Surreply. *See* ECF No. 29. Plaintiff states that a surreply is necessary to respond to two contentions the Government made for the first time in its reply in support of its jurisdictional arguments: (1) that the BIA's recognition of a Winnemucca tribal council has been appealed to the IBIA, and (2) that the alleged trespassers on Colony lands have sued the Government. *Id.* at 2. The Government responds that neither of those contentions were used to support its claims for dismissal but rather were raised simply to update the Court on recent factual developments pertinent to the case. ECF No. 30 at 2. Thus, the Government argues, there were no "new" arguments raised in its reply that warrant a surreply. *Id.* The Court agrees.

A surreply is appropriate when a party raises new arguments for the first time in a reply brief, thus depriving the opposing party the opportunity to respond. *Hardy v. United States*, 153 Fed. Cl. 624, 628 (2021). Here, the Government never used the two contentions Plaintiff addresses to support its dismissal arguments. Rather, it included them in its reply merely as a factual update for the Court. *See* ECF No. 28 at 8–9. The Court has not relied on either contention in deciding the question of dismissal, and thus a surreply would not assist the Court.

### VI.   The Government's Notice of Additional Authority Properly Provides the Court with New and Pertinent Binding Case Law.

While the Court's rules do not address the filing of notices of supplemental authority, the Government's notice appropriately advises the Court of a new development in relevant case law that post-dates the completion of both the briefing and oral argument in this matter. Not only is the Government's notice helpful to the Court, as *Navajo Nation* is both highly relevant to the issues in this matter and binding authority, the notice does not prejudice Plaintiff since it merely directs the Court to the new decision without including any legal argument. Accordingly, the Court will not strike the Government's notice but will, per the alternative request, consider Plaintiff's response to the Government's notice set forth in its Motion to Strike.

### CONCLUSION

For the above stated reasons, the Government's Motion to Dismiss (ECF No. 23) is **GRANTED**. Plaintiff's Motion for Leave to File a Surreply (ECF No. 29) is **DENIED**. Plaintiff's Motion to Strike (ECF No. 36) is **DENIED IN PART** and **GRANTED IN PART**. The Clerk is directed to enter judgment accordingly.

**SO ORDERED**.

Dated: August 25, 2023

_____*/s/ Kathryn C. Davis*_____
KATHRYN C. DAVIS
Judge